Exhibit "B"

# OPERATING AGREEMENT OF ETEGRA-COOVERCLARK JV1, LLC

THIS JOINT VENTURE OPERATING AGREEMENT, the "Operating Agreement," is entered into the 17th day of September, 2021 by and **ETEGRA, Inc.** ("**ETEGRA**"), a Missouri corporation and **CooverClark & Associates, Inc. ("CooverClark")**, a Colorado corporation, (each a "Member" and collectively the "Members"). The Operating Agreement shall govern the business of the joint venture between the Members, entitled **ETEGRA-CooverClark JV1, LLC** and formed by an agreement between the parties executed on the 17th day of July 2019.

WITNESSETH

WHEREAS, the Government of the United States of America, acting through the United State Army Corp of Engineers ("Client") has issued Solicitation No. W912QR20R0021 for The Department of the Army, US Army Corps of Engineers, Louisville District for a variety of Architect/Engineer services for Army Reserve projects nationwide (including Puerto Rico, Guam, and American Samoa) as a set-aside/small business procurement under NAICS code 541330 and size standard of $16.5mil (hereinafter sometimes referred to as the "Solicitation");

WHEREAS, the Members desire to organize a limited liability company for the sole purpose of carrying on a joint venture to perform the Contract, and to that end intend for this Agreement (as defined below) to constitute the governing document for the joint venture between the parties consistent with 13 C.F.R. § 124.513 for purposes of the Act (as defined below);

WHEREAS, the Members intend for the Company (as defined below) to satisfy all criteria to remain eligible to receive award of the Contract in accordance with the SBA's regulations; and

WHEREAS, the Members desire to enter into this Agreement to set forth their mutual agreements with respect to the Capital Contributions to be made to the Company by the Members, the allocation of profits and losses, cash flow, and other proceeds by and among the Members, the management and governance of the Company, the respective rights, obligations, and interests of the Members to each other and to the Company, and certain other matters.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, it is hereby agreed as follows:

## ARTICLE I - BACKGROUND AND PURPOSE

**1.1** The Parties shall operate under the name **ETEGRA-CooverClark** "a Joint Venture" ("Joint Venture" or "Company"). The principal office shall be located at 1121 Olivette Executive Parkway, Suite 100, Olivette, MO, 63132.

**1.2** This Agreement defines the governance and operating procedures and obligations of the Parties as between each other. Should a conflict or ambiguity occur between this JV Operating Agreement and the Joint Venture Agreement, the JV agreement shall prevail. For clarity, that one agreement contains a subject matter not contained in the other agreement shall not be deemed a conflict or ambiguity and the subject matter shall be given full effect.

**1.3** The Joint Venture shall not engage in any business other than that described in the JV Agreement. All transactions involving the Joint Venture shall be conducted for the benefit of the Joint Venture.

**1.4** Unless otherwise required by Owner or mutually agreed in writing by the Parties, all transactions and business with respect to Projects shall be conducted through and in the name of the Joint Venture. This Agreement shall not limit either Party from engaging in business independent of JV Projects.

## ARTICLE II - DEFINITIONS

The following capitalized terms shall have the meaning specified in this Article I.

"**Affiliate**" means, with respect to any Member, any Person:

i. which owns more than fifty-one (51%) of the voting interests in the Member;

ii. in which the Member owns more than fifty-one (51%) of the voting interests; or

iii. in which more than fifty-one (51%) of the voting interests are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above.

"**Agreement**" means this Joint Venture Operating Agreement of the Company, as it may be amended and in effect from time to time.

"**Capital Account**" means the account to be maintained by the Company for each Interest Holder reflecting such Interest Holder's Capital Contributions in accordance with generally accepted accounting principles consistently applied (and consistent with the requirements for the performance of the Contract).

"**Capital Contribution**" means as to a Member the total amount of cash, property, or services contributed or, as the context of this Agreement requires, to be contributed to the Company by such Member.

"Company" means **ETEGRA-CooverClark JV 1**, a Missouri limited liability company.

"**Interest**" means an ownership interest in the Capital Accounts and a share of the Profits and Losses of, and the right to receive distributions from, the Company.

"**Interest Holder**" means any Person who holds an Interest, whether as a Member or a Transferee.

"**Joint Venture Agreement**" means the joint venture agreement entered into by **ETEGRA** and **CooverClark** on July 17, 2019, to pursue the Contract as a joint venture.

"**Liabilities**" means claims, suits, actions, losses, damages, expenses (including reasonable attorneys' fees), and other liabilities.

"**Management Committee**" means that committee of four (4) Managers

"**Manager**" means each of the individuals appointed pursuant to Section 7.1 and as otherwise defined in the Act.

"**Managing Member**" means **ETEGRA**

"**Member**" means **CooverClark**, and any Transferee admitted as a member pursuant to Section 7.3.

"**Membership Rights**" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to appoint Managers; (iv) right to vote on matters coming before the Members.

"**NAICS**" means the North American Industrial Classification System.

"**Operating Account**" means the special bank account established in the name of **Etegra-CooverClark JV1, LLC** in accordance with the requirements of 13 C.F.R. § 124.513.

"**Percentage**" means, as to **ETEGRA**, 50% and, as to **CooverClark**, 50% subject to change based on any Transfer as may be affected in accordance with the terms of this Agreement.

"**Person**" means individual, entity, or legal person.

"**Profit**" and "**Loss**" means, for each fiscal year of the Company (or other period for which Profit or Loss must be computed), the Company's net income or loss determined in accordance with generally accepted accounting principles consistently applied (and consistent with requirements for the performance of the Contract).

"**Responsible Manager**" means the individual appointed pursuant to the Joint Venture Agreement. The managing venturer is responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, but other partners to the joint venture may participate in all corporate governance activities and decisions of the joint venture as is commercially customary. The Responsible Manager is simply the individual who oversees the administrative and is the process lead of the JV. The Project Managers report to the Responsible Manager for purposes of the contract, ie. submitting invoices, etc.

**"Project Manager"** means the individual delegated to lead the projects from a technical standpoint. Executing the day-to-day functions of project management.

"**Secretary of State**" means the MISSOURI Secretary of State.

"**Subcontract**" means any agreement, including but not limited to contracts, purchase orders, and changes and modifications to contracts and purchase orders, entered into between the Company and any subcontractor, supplier, distributor, vendor, or other person for the performance of any portion of the Contract as contemplated by Section 15.2 to this Agreement.

"**Treasury Regulation**" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"**Transfer**" means any sale, exchange, assignment, transfer, attachment, hypothecation, pledge, other disposition, or with respect to any Person (including, without limitation, any Member), a change of control within or a sale of all or substantially all of the assets of such Person.

"**Withdrawal**" means a Member's resignation, dissolution, bankruptcy, or other disassociation with or termination of continued membership in the Company by means other than a Transfer.

Terms defined elsewhere in this Agreement shall have the meaning so ascribed and, for ease of reference. In construing defined terms, definitions in the singular shall include usages in the plural and vice versa.

## ARTICLE III - ORGANIZATION AND PURPOSE

3.1 **Formation**. The Company was organized under the Act by filing Articles of Organization with the Missouri Secretary of State on July 31, 2019.

3.2 **Name of the Company**. The name of the Company Etegra-CooverClark JV1. The Company may conduct business under that name and under any other name or names which the Management Committee selects. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file an assumed business name as required by relevant law. **ETEGRA** and **CooverClark** grant the Company a non-transferable, royalty-free license to use the word and trade names "**ETEGRA**" and "**CooverClark**" and related trademarks in the Company's name and trademarks solely in connection with the conduct of the Company's business for the duration of the Company's term, and represent and warrant to the Company and the other Members that they have the right, power, authority, and interest to grant such license.

3.3 **Purpose**. The Company is organized solely to propose, negotiate, enter into, and perform the Contract and potentially bid on within a two-year period of the effective date of the Contract and negotiate, enter into, and perform the work, and to do any and all things necessary, convenient, or incidental to that purpose.

3.4 **Term**. The term of the Company began upon filing of the Articles of Organization with the Secretary of State, and shall continue until the completion, expiration, or earlier final termination of the last contract as may be awarded to the Company pursuant to Section 3.1 and in accordance with 13 C.F.R. § 121.103, following contract close-out and the post-termination winding up of the Company, unless the Company is sooner dissolved pursuant to this Agreement or the Act.

3.5 **Principal Office**. The principal office of the Company is 1121 Olivette Executive Parkway, Suite 100, Olivette, MO 63132. One (1) or more additional offices may from time to time be designated and established by the Management Committee.

3.6 **Registered Office and Registered Agent**. The initial registered office and registered agent of the Company shall be as designated in the initial Articles of Organization. The Registered Office and/or Registered Agent may be changed from time to time. Any such change shall be made in accordance with the Act. If the Registered Agent resigns, the Company shall promptly appoint a successor.

3.7 **Members**. The initial Members are **ETEGRA** and **CooverClark**. The present mailing addresses, Interests, and Percentages of such Members are set forth on Appendix A.

## ARTICLE IV - CAPITAL

4.1 **Initial Capital Contributions**. After being notified by the USACE of its intention to enter negotiations of the Contract with the Company, **ETEGRA** shall make a Capital Contribution of $500 and **CooverClark** shall make a Capital Contribution of $500.

4.2 **Additional Capital Contributions**. As and when the Management Committee determines by unanimous vote, that the Company requires additional capital to perform its obligations under the Contract, the Members shall forthwith make Capital Contributions in the amounts so determined in proportion to their respective Percentages. The Management Committee shall notify each Member of (i) the total amount of additional Capital Contributions, (ii) each Member's proportionate share of such total additional Capital Contributions, and (iii) the date each Member's additional Capital Contribution is due and payable, which date shall be no less than thirty (30) days after the notice has been given.

**4.3 Default and Consequences**. If a Member (the "Defaulting Member") fails to make any Capital Contribution required under Section 4.1 or 4.2 when due, the amount in default shall bear interest from time to time at the highest prime rate for major New York City banks published in The Wall Street Journal, but not exceeding the maximum rate permitted by applicable law. Interest shall be compounded quarterly. No distribution will be paid to a Defaulting Member until any such amount in default, and any Member Loans, in each case including interest, have been cured, paid, or repaid, as the case may be, in full. To that end, for so long as the Defaulting Member remains in default, all distributions otherwise payable to the Defaulting Member shall be retained by the Company and applied first to the payment of any interest accrued under this Section 4.3 and then to the payment of the Capital Contribution in default.

**4.4 No Interest on Capital Contributions**. Interest shall not accrue or be paid on Capital Contributions or Capital Accounts.

**4.5 Return of Capital Contributions**. Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive any return of any Capital Contribution. If an Interest Holder is entitled to a return of any Capital Contribution(s), the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

**4.6 Capital Accounts**. A separate Capital Account shall be maintained for each Interest Holder. If there is a Transfer of an Interest in accordance with Article XII, the Transferee shall succeed to the Capital Account of the Transferor to the extent attributable to the transferred Interest.

**4.7 Limitations**. Except as specifically provided in Section 4.1 or 4.2, no Member shall be obligated to make any contribution to the capital of the Company, to make any loan to the Company, or to guaranty any debt, loan, credit line, obligation, or other liability of the Company. Without limiting Section 6.5.4, no Member shall be obligated, upon dissolution of the Company or otherwise, to restore a negative Capital Account.

## ARTICLE V - ALLOCATIONS AND DISTRIBUTIONS

**5.1 Allocation of Profit or Loss**. Except as otherwise expressly provided in this Agreement, Profits and Losses shall be allocated to each Member in amounts commensurate with the work performed by that Member.

**5.2 U.S. Federal Income Tax Allocation.** If or when tax returns are needed to be filed and there are cost incurred, the partners shall each pay the percentage commensurate with their level of participation in the Joint Venture of any cost incurred. The work shall be agreed upon unanimously by the Management Committee before services are contracted.

## ARTICLE VI - STAFFING

**6.1** The Parties shall furnish from their respective organizations, all of the personnel, skill, experience and knowledge which is required for the efficient and expeditious management of the Joint Venture and, except with respect to those Services subcontracted to sub consultants, all of the personnel, skill, experience and knowledge which is required for the efficient and expeditious performance of the Prime Contracts awarded the JV. Other personnel may be assigned to the Project at the request of the Management Committee as required for the performance of the Joint Venture's obligations under any

Prime Contracts. Personnel of each Party assigned to the Project shall remain employees of their respective employers and are not employees of the Joint Venture.

**6.2** If personnel of either Party should become unacceptable to Owner under the terms of the Prime Contract or objectionable in the reasonable opinion of the other Party, the Management Committee shall convene in an attempt to reconcile the situation. If reconciliation is not possible, the employing Party shall cause the subject person's removal from the Project, provided that where a Party (as opposed to Owner) is seeking removal, such Party's objection to the subject person is reasonable.

## ARTICLE VII - MANAGEMENT

**7.1 Management and Management Committee**

**7.1.1** **Management by Management Committee**. The business and affairs of the Company shall be managed by, and under the direction and control of, the Management Committee. The Management Committee shall consist of **four (4)** individuals (each a "Manager"). Two (2) of the Managers shall be appointed by **ETEGRA** and **two (2)** of the Managers shall be appointed by **CooverClark**. The Managers of the Management Committee are set forth on Appendix B, attached hereto. Each Manager shall be entitled to cast one (1) vote, and the Manager(s) representing each of the Members shall be entitled to cast the aggregate number of votes on any action to be voted upon by the Management Committee set forth opposite such Member's name below (in which case, if only one Manager representing **ETEGRA** shall be present at any Management Committee meeting, such Manager shall have the right to cast all **ETEGRA** Manager representative votes):

| Representative Designated by: | Aggregate No. of Votes: |
|---|---|
| **ETEGRA**: | 2 |
| **CooverClark:** | 2 |

**7.1.2** **Powers of Management Committee.** The Management Committee shall have the exclusive power and authority to manage the business and affairs of the Company, including in performing the Contract. Decisions of the Management Committee within its scope of authority shall be binding upon the Company, all Managers, the Project Manager, and each Member.

**7.1.3** **Removal and Resignation.** Each Manager serves at the pleasure of the Member appointing him or her and may be removed at any time by the Member appointing him or her, with or without cause. Any Manager may resign at any time. A vacancy left by the death, disability, resignation, or removal of any representative of any Manager shall be filled by the Member appointing that representative within ten (10) business days of the vacancy.

**7.1.4 Meetings of Management Committee; Referral of Matters to Members; Action by Written Consent.** Meetings of the Management Committee shall be held at any place that the Management Committee determines. Meetings may be held by communicating simultaneously by conference telephone or similar communications equipment. At all meetings of the Management Committee, a majority of the Managers shall constitute a quorum for the transaction of business, so long as a Manager from each of **ETEGRA** and **CooverClark** is present in accordance with Section 7.1.1, and the act of a majority of the Managers present at any meeting at which there is a quorum shall be the act of the Management Committee, except as may be otherwise specifically provided by law or the Articles of Organization.

**7.1.4.1** At all times the Members will (and will cause their respective designated Manager representatives to) conduct themselves and cooperate with one another reasonably and in good faith. No Member shall subvert, or cause their respective designated Manager representatives to subvert, the quorum requirement (for example) by refusing or failing to attend or otherwise to participate in a meeting for the purpose of preventing a matter from being discussed and acted upon by the Management Committee. If, for any reason or no reason, the foregoing quorum requirement cannot be satisfied, and the Management Committee therefore cannot convene to discuss and act upon any particular matter, such matter shall be referred to the Members who shall discuss and act upon such matter in accordance with Section 7.1.4 of this Agreement.

**7.1.4.2** Any Manager may convene a general meeting of the Management Committee upon at least ten (10) business days notice to the other Managers. Special meetings of the Management Committee can be called by any Manager upon at least two (2) business days notice to the Managers and a statement of the specific business or matters for which the special meeting is called; no other business may be conducted at a special meeting than that which is noticed. The Management Committee will not take any action at meetings unless a quorum is present. A Manager waives notice if before or after the meeting the Manager signs a waiver of the notice which is filed with the records of the Management Committee or attends the meeting in person or by proxy without objection to the lack of notice at the beginning thereof Minutes of each meeting and a record of each decision shall be kept by an individual designated by the Management Committee.

**7.1.5 Decisions of Managers.** A unanimous vote of the Managers shall be required to approve any matter coming before the Management Committee. No Manager shall independently have any power or authority on behalf of the Company or the Management Committee unless expressly delegated specific powers and authority by the Management Committee, unless expressly delegated by this Agreement, in each case subject to Section 7.1.1 and the other terms and conditions of this Agreement.

**7.1.6 Fiduciary Duties.** For the purpose of operations and decisions within the Company, the Managers, and the Members on behalf of themselves and the Managers they appoint, owe fiduciary duties, and duties of good care and good faith and loyalty, to the Company and the Members (or the other Member, as the case may be). The foregoing shall not restrict or call into question the right of the Members and Managers to engage in business independent of the Company whether or not such business is in competition with the Company provided a Member or Manager shall not except with the Company's knowledge

and consent engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Member's or Manager's professional judgment with respect to a Company Project.

**7.2 Project Manager**

**7.2.1 Appointment of Project Managers.** As per the JV proposal to the USACE for the subject IDIQ, Project Managers for projects lead by an Architect, Planner, or Landscape Architect lead shall be appointed by CooverClark. All other Project Managers shall be appointed by ETEGRA. Employees from either company shall be eligible to be appointed for any project if acceptable to the employing firm. Initial Project Managers are set forth on Appendix C, attached hereto.

**7.2.2. Powers of Responsible Manager**. The Responsible Manager shall carry out the policy decisions of the Management Committee.

**7.2.3.** Without limiting the generality of the foregoing, the Project Manager shall be responsible for the Company's performance of its day-to-day responsibilities under the Contract, including (a) assembling the project team of subcontracts, (b) the daily direction, coordination, operation and management of the Services to be performed under the Prime Contract, (c) with respect to performance of the Services, and (d) the primary contact with Owner on behalf of the Joint Venture and any others performing Services related to the Project, and the Services performed under the Prime Contract.

**7.3 Required Approval of Members.** Notwithstanding anything to the contrary in this Agreement, none of the Company, the Management Committee, the Managers, the Project Manager, or the Members shall undertake any of the following without the unanimous approval of the Members:

**7.3.1** Any amendment, modification, supplement, or repeal, in whole or in part, of the Company's Articles of Organization or this Agreement;

**7.3.2** Admitting new or additional Members, including admitting any Transferee or Interest Holder as a Member;

**7.3.3** Except for Capital Contributions further to Sections 4.1 or 4.2 and Member Loans further to Section 4.3, loans or advances to or from, Capital Contributions to, and contracts or agreements of any kind or nature with (i) Members, (ii) Affiliates of Members, or (iii) Affiliates or family members of Managers, the Project Manager, or officers, directors, partners, members, or controlling shareholders of Members;

**7.3.4** Withdrawal of a Member;

**7.3.5** A Transfer of any Interest except as provided in Article XII;

**7.3.6** Electing to be taxed as a corporation rather than a partnership for federal income tax purposes;

**7.3.7** Initiation of any claim or litigation under the Contract and any final decision to continue prosecution of or settle such litigation or claim; or

**7.3.8** Bidding and performing, if awarded, additional federal contracts arising out of procurements beyond the Contract arising out of the Solicitation.

**7.4 Meetings of and Voting by Members**

7.4.1 **Requirements for Meeting**. A meeting of the Members may be called at any time by any Member for purposes of considering those matters set forth in Section 7.3. Meetings of Members shall be held at the Company's principal place of business or at any other reasonable place determined by the Member calling the meeting. Not less than forty-eight (48) hours before each meeting, the Member calling the meeting shall give notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings or is present at the meeting in person or by proxy. Meetings may be held by communicating simultaneously by conference telephone or similar communications equipment, and participation by such means by a Member shall be deemed presence in person at the meeting. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact. The Members who own and hold a majority of the votes entitled to be cast on a matter, present in person or represented by proxy, shall be necessary to act, and shall constitute a quorum for the taking of any, action on that matter, except as may be otherwise specifically provided by law or the Articles of Organization.

7.4.2 **Decisions of Members.** Except as otherwise provided in this Agreement, including without limitation Section 7.4.1, the affirmative vote of Members holding a simple majority of the Percentage Interests shall be required to approve any matter coming before the Members.

7.4.3 **Decisions Without a Meeting.** In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding a simple majority of the Percentage Interests, except for those matters to be decided in accordance with Section 7.3 which shall require a unanimous written instrument indicating the consent of all Members.

**7.5 Indemnifications.**

7.5.1 **Member General Indemnification.** Each Member shall indemnify, defend, and hold harmless the Company and the other Member from and against any and all Liabilities that arise out of, or are related to, any gross negligence, bad faith, willful misconduct, or breach of fiduciary duty, knowing violation of applicable law, or breach or default by such Member of its obligations under this Agreement, including without limitation Liabilities arising by virtue of any gross negligence, bad faith, willful misconduct, or breach of fiduciary duty or duties of care, loyalty, and good faith by any Manager appointed by such Member.

7.5.2 **Member Contract Indemnification.** Each Member shall indemnify, and hold harmless, the other Member(s) from and against all Liabilities that arise out of or are related to any breach or default by the Company of the Contract as a result of any negligent act or omission committed by such Member or its agents under this Agreement or in any way connected with the performance of this Agreement, including without limitation Liabilities arising by virtue of the joint and several liability of the Members to the Client and the related provisions of the Contract. For the avoidance of doubt, this indemnification shall apply regardless of decisions, actions, inactions, or votes of the Members, the Managers, or the Management Committee.

7.5.3 **Member Negative Capital Account Indemnification.** Following dissolution of the Company, each Member shall indemnify and hold harmless the other Member to the extent

it had a negative Capital Account balance which was disproportionately negative in relation to the Capital Account balance of the other Member(s) based on their respective Percentages.

7.5.4 **Notice.** In the event that any claim, demand, action, suit, or proceeding shall be instituted or asserted or any loss, damage, or claim shall arise in respect of which indemnity may be sought under Section 7.5.1, 7.5.2, or 7.5.3, the indemnified Person shall promptly notify the Company and each Member in writing. Failure to provide notice shall not affect the indemnifying Person's obligations hereunder except to the extent the indemnifying Person is actually prejudiced thereby.

7.5.5 **Contest.** An indemnifying Person under Section 7.5.1, 7.5.2, or 7.5.3 shall have the right to participate in and control the defense of any such Liability, and in connection therewith, to retain counsel reasonably satisfactory to the indemnified Person, at the indemnifying Person's expense, to represent each indemnified Person and any others the indemnified Person may designate in such claim, demand, action, suit, or proceeding. The indemnifying Person shall keep the indemnified Person advised of the status of such claim, demand, action, suit, or proceeding and the defense thereof and shall consider in good faith recommendations made by the indemnified Person with respect thereto.

## ARTICLE VIII - COMPENSATION

**8.1** Subsequent to the execution of this Agreement, Exhibit A (Compensation) may be prepared at the discretion of the Management Committee, the intent of which is to set forth any details not otherwise stated in this Agreement by which the Parties are to be compensated for their Services. Exhibit A may include, without limitation, billing rates, expenses and any other compensation and reimbursement terms. The terms of Exhibit B shall comply and be consistent with the terms of any Prime Contract and shall be revised to include additional detail as appropriate to the extent that the Joint Venture agrees to perform additional services by modifications to the Prime Contract.

**8.2** Each Party shall invoice the Joint Venture for its Services in conjunction with the execution of Task Orders. Invoices will be directed to the Project Manager, along with subconsultant invoices, for initial review before forwarding to the Responsible Manager for approval of invoicing the client.

**8.3** All invoices for Services performed by each Party and any sub consultants will be submitted by the Joint Venture to Owner only if such invoices are in compliance with the terms of the Prime Contract.

**8.4** Compensation received by the Joint Venture from the Prime Contract shall be applied in the following order: (1) to the payment of liabilities and debts of the Joint Venture, including any sub consultants of the Joint Venture if contracted directly to the Joint Venture and to the Parties in accordance with their invoices submitted, subject to any limitations under this Agreement.

**8.5.** To the extent not billable to the Owner, compensation to Parties of Administrative Staff, Financial Manager, and any other administrative costs, approved by the Management Committee will be paid from Contributions (Capital Account) quarterly.

**8.6.** All their party administrative, financial, or legal services shall be approved along with billing rates, by the Management Committee in advance of the consideration of payments.

**8.7.** In house providers (employees of the Managers) of administrative, financial, or legal services shall be approved by the Management Committee along with the billing rates in advance of consideration for payment.

**8.8.** Compensation received by the Joint Venture from the Prime Contact may be earmarked by the Joint Venture when appropriate and shall be deposited in the Joint Venture Capital Account. In the event any invoiced costs submitted by a Party to the Joint Venture and subsequently to Owner are disallowed due to non-compliance with the Prime Contract, including any FAR requirements (to the extent that FAR is applicable under the Prime Contract), then any amounts paid or due to be paid thereon by the Joint Venture to the submitting Party shall be subject to appropriate adjustment to reflect such disallowance.

**8.9.** Distributions to the Parties shall be subject to withdrawal by check or electronic funds transfer only. In the interest of greater fiscal control, such withdrawals from the Joint Venture Bank Account will be generated only upon submission of written approval by an employee of each Party who is authorized by their employer to approve distributions. Such approval may be provided by email. The Finance Manager will process all withdrawals and will refrain from doing so until written approval is obtained from each Party.

## ARTICLE IX - PROPERTY

**9.1** The Parties acknowledge that in pursuing Projects and performing the Services they may be required to utilize documents, records, drawings, specifications, reports, studies, notes, diagrams, sketches, models, charts, calculations, methodologies, know-how, processes, techniques, tools, software, computer code, data files, standards, manuals, photographs, videos, correspondence, and other information, documentation, materials and items, and all intellectual property associated therewith that the respective Parties: (A) developed or purchased prior to execution of this Agreement; (B) may develop contemporaneously in pursuing the Project and performing the Services yet is not required to be developed in executing the Services; or (C) may develop in executing the Services (collectively, "Private Work Product"). Except to the extent prohibited by any applicable requests for qualifications, requests for proposals or the Prime Contract, each Party shall retain their respective ownership and intellectual property rights in all Private Work Product, including all copyrights, trademarks and patents. Each Party is entitled to make and retain copies of the Private Work Product developed under this Section IX, if provided to Owner for the sole purpose of pursuing the Project and performing the Services.

## ARTICLE X - INSURANCE

**10.1** Unless otherwise required by Owner, it is the intent of the Parties that no insurance will be purchased or maintained by or in the name of the Joint Venture. To the extent that Owner requires the Parties to purchase and maintain insurance in the name of the Joint Venture the Parties will pay for the insurance in accordance with their Percentage Interest unless the Parties agree otherwise in writing or unless the cost of the insurance can be expensed to the Project.

**10.2** Where the insurance is required to be purchased in the name of the Joint Venture or to the extent that the Prime Contract provides insurance under an owner controlled insurance program,

commonly known as an "OCIP," the Parties agree to pay for any deductibles in accordance with their division of liability.

**10.3** The Parties agree that the insurance requirements set forth in the Prime Contract take precedence over any requirements set forth in this Agreement, such requirements are incorporated herein in this Agreement contain only the minimum insurance requirements for the Parties.

**10.4** The Parties shall separately maintain at their expense the following minimum insurance during the term of this Agreement. The premiums for this insurance shall not be reimbursed by the JV. Insurer to have an A.M. Best rating of no less than A- and authorized to do business in the state in which the Services are being provided:

**10.4.1** Commercial General Liability Insurance on a coverage form equal to ISO CG 00 01, on an occurrence basis, with a limit of not less than $1,000,000 per occurrence and $2,000,000 general aggregate, including a per-project endorsement.

**10.4.2** Business Automobile Liability Insurance to include coverage for all hired, owned and non-owned vehicles used in connection with this agreement, with a combined single limit of not less than $1,000,000.

**10.4.3** Workers' Compensation Insurance, in accordance with the laws of the state in which the Services are being performed, and Employers' Liability Insurance, including occupational disease with limits according to such statutory requirements.

**10.4.4** Professional Liability and Pollution Incident Insurance in the minimum amount of $1,000,000 per claim and annual aggregate.

**10.5** The above policies shall not contain any exclusion for liability arising out of the Parties participation in a joint venture. Each Party shall include the other Party, and its parent companies, affiliated and subsidiary entities, directors, officers and employees, as additional insureds on its commercial general liability and business automobile liability policies, such insurance shall be primary, and any insurance maintained by the Parties shall be deemed supplementary.

**10.6** Each Party shall furnish to the other certificates of insurance evidencing compliance with the insurance requirements of this Agreement and the Prime Contract, if applicable. All policies shall be endorsed to state that such insurance shall not be canceled or non-renewed by the Insurer without at least thirty (30) days written notice to the other Party (10 days if premium is unpaid).

**10.7** The Parties waive all rights against each other for damages covered by property insurance.

**10.8** Sub consultants shall be required to maintain insurance of the types and with the minimum limits set forth in this Article 9 (Insurance) unless otherwise determined by the Management Committee or as required by the Prime Contract, whichever requirements are greater. Sub consultants shall include each Party and the Joint Venture as additional insureds on their commercial general liability and business automobile liability policies and such insurance shall be primary and any insurance maintained by the Parties shall be deemed supplementary.

**10.9** The Parties agree to waive all claims of any kind against each other, their respective directors, officers, employees, sub consultants and agents (and shall cause their insurance carriers providing insurance pursuant to this Agreement to do the same in each insurance policy) to the

extent that any damages arising out of or relating to such claims are covered by any insurance proceeds under the insurance required to be provided through this Agreement. Where sub consultants are subcontracted directly to the Parties, then the Parties shall cause a similar provision to be set forth in such sub consultant contracts.

## ARTICLE XI - WITHDRAWAL

**11.1 Termination of Membership.** No Member shall have the right to voluntarily Withdraw (that is, resign) without the unanimous approval of the Members further to Section 7.3 (and on such terms and conditions as may be specifically agreed upon at such time among the Members and the Member proposing to Withdraw) and the Client. Upon Withdrawal of a Member (the "Withdrawn Member"), without limiting any rights or claims of the Company or the other Members against the Withdrawn Member, the Withdrawn Member shall cease to be a Member, and its Membership Rights shall immediately terminate. Withdrawal shall not dissolve the Company. Each Member acknowledges its responsibility to the Client and the SBA to complete performance of the Contract, despite the Withdrawal of the other Member.

**11.2 Distributions.** Except upon a voluntary Withdrawal approved further to Section 7.3, the Withdrawn Member shall not be entitled to receive a distribution or return of any positive balance of its Capital Account; provided, however, that such Withdrawn Member shall be entitled to receive the positive balance, if any, of its Capital Account upon the winding up of the Company further to Article XII and subject to Section 5.4.

**11.3 Attorney-in-Fact.** The Withdrawn Member hereby irrevocably constitutes and appoints each of the remaining Members as the Withdrawn Member's attorney-in-fact to execute and deliver all documents necessary or appropriate to carry out the provisions of this Article XI. The appointment by the Withdrawn Member is irrevocable and shall be deemed to be a power coupled with an interest and survive the dissolution or bankruptcy of the Withdrawn Member

## ARTICLE XII - ADMISSIONS AND TRANSFERS

**12.1** Transfers. No Interest Holder may Transfer all or any portion of its Membership Rights unless the following conditions ("Conditions of Transfer") are first satisfied:

**12.1.1 Transferee Bound by Agreement.** The Transferee delivers to the Company and the remaining Member a written agreement to be bound by all the terms of this Agreement;

**12.1.2 No Deemed Termination of Company.** The Transfer will not result in the termination of the Company pursuant to Code Section 708;

**12.1.3 Right of First Refusal.** The Transferor complies with the provisions set forth in Section 12.4

**12.2** Transfer of Interest Only. If the Conditions of Transfer are satisfied, then an Interest Holder may transfer all or any portion of its Interest. Except as otherwise provided in Section 7.3, the Transfer of an Interest pursuant to this Article XII shall not result in the Transfer of any of the Transferor's other Membership Rights, and the Transferee of the Interest shall have no right to and shall not become a Member or have or exercise any Membership Rights other than the transferred Interest.

**12.3 Other Transfers Void.** Each Member acknowledges the reasonableness of the prohibition contained in this Article XII in view of the purpose of the Company, the relationship of the Members, the requirements of the Contract, and the expectations of the Client. A purported transfer of any Membership Rights in violation of the prohibition contained in this Article XII shall be invalid, null and void, and of no force or effect, and any Person to whom Membership Rights are attempted to be so Transferred in violation of this Article XII shall not have any Membership Rights or be an Interest Holder.

**12.4 Right of First Refusal.**

**12.4.1 Transferor Notice**. If an Interest Holder (the "Transferor") receives a bona fide written offer which it wishes to accept from any other Person to purchase all or any portion of the Transferor's Membership Rights (the "Transferor Interest") then, prior to any Transfer of the Transferor Interest, the Transferor shall give the Company and the other Members written notice (the "Transfer Notice") setting forth the following:

**12.4.2** a copy of the Transferee's offer certified by the chief executive officer of the Transferor as being true and complete; and

**12.4.3** the Transferor's offer to sell the Transferor Interest to the Company and the remaining Member(s) further to Article XII for a price equal to that contained in the Transferee's offer (but on the payment terms set out in Section 12.4.5.

**12.4.4 Options.** The Transferor's offer under Section 12.4 shall be and remain irrevocable and open for acceptance for a period (the "Offer Period") ending at 11:59 P.M., Eastern Time, on the fortieth (40th) day following the date the Transfer Notice is given to the Company and the other Member. At any time during the first thirty (30) days of the Offer Period, the other Member shall have the right of first refusal and may accept the Transferor's offer by timely giving a written notice to the Transferor (and copied to the Company) of its acceptance of the Transferor's offer (an "Acceptance"). If the other Member rejects or fails to accept a Transferor's offer, the Company shall have the second right of first refusal and may accept the Transferor's offer by timely giving an Acceptance during days 31-40 (inclusive) of the Offer Period. Managers appointed by the Transferor shall not vote on the Management Committee decision of whether the Company should accept a Transferor's offer. The Acceptance shall fix a closing date for the purchase transaction, which shall not be earlier than ten (10) or more than ninety (90) days after the expiration of the Offer Period. If the remaining Member or Company accepts the Transferor's offer, then those parties shall fix a closing date for the purchase transaction.

**12.4.5 Payment Terms.** If either the Company or the remaining Member accepts the Transferor's offer, the purchase price shall be paid, without prepayment penalty, in five (5) equal annual installments, including simple interest commencing as of the closing date at the highest prime rate for major New York City banks published in *The Wall Street Journal* fixed as of the last business day prior to the closing date, the first such installment due on the closing date. Such obligation shall be evidenced by promissory note(s) in negotiable form and secured by a pledge of the Transferor Interest, executed by purchaser(s) on the closing date. The Transferor and the Company or the remaining Member shall in good faith enter into such other documents as may be necessary or appropriate to affect the purchase, sale, and payment terms of the purchase transaction.

**12.4.6 Free Transfer Period.** If neither the Company nor the remaining Member accepts the Transferor's offer (within the time and in the manner specified in this Section), then the Transferor shall be free for a period of thirty (30) days after the expiration of the Offer Period to Transfer the Transferor Interest to the Transferee, for the same or greater price and on the same terms and conditions as set forth in the Transfer Notice (subject always, however, to the Conditions of Transfer (other than Section12.4)). If the Transferor does not Transfer the Transferor Interest within the aforesaid thirty (30) day period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section 12.4.6 shall terminate.

**12.4.7 Admission of Transferee as Member.** Notwithstanding anything herein to the contrary, a proper and permitted Transferee shall not become a Member or be entitled to any Membership Rights other than the Interest so Transferred unless and until the Transferee is admitted as a Member by a unanimous vote of the Members.

## ARTICLE XIII - DISSOLUTION AND LIQUIDATION

**13.1 Events of Dissolution.** The Company shall be dissolved upon the happening of any of the following events:

**13.1.1 Member's Vote.** Upon the unanimous vote of the Members; or

**13.2 Procedure for Winding Up and Dissolution.** If the Company is dissolved, the Management Committee shall wind up the affairs of the Company. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Members who are creditors, in satisfaction of the liabilities of the Company (including Member Loans), and then, amounts in excess of any reserves deemed reasonably necessary by the Management Committee to pay any and all of the Company's claims and obligations shall be distributed to the Interest Holders in accordance with Section 5.3 of this Agreement.

**13.3 Termination.** The Management Committee shall comply with any requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets. Upon completion of the winding up, liquidation, and distribution of the assets, the Company shall be deemed terminated.

## ARTICLE XIV - BOOKS, RECORDS, AND ACCOUNTING

**14.1 Bank Accounts.**

**14.1.1 Operating Account**. The Company shall establish and maintain an Operating Account into which shall be deposited all Capital Contributions and all payments due the Company for performance of the Contract and from which, except as provided in Section 4.6 all expenses incurred under the Contract shall be paid. Withdrawals from the Operating Account shall require the signature of a designee of each Member.

**14.1.2 Banks.** Unless otherwise agreed by the Members, the Operating Account and any other bank accounts deemed necessary by the Management Committee shall be held at financial institutions with net assets of Two Hundred Fifty Million Dollars or more.

14.2 **Books and Records.**

**14.2.1 Maintenance of Records.** The Company shall keep or cause to be kept complete and accurate accounting, tax, and other administrative books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. Those books and records include, without limitation, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments thereto, a current list of the names and last known business, residence, or mailing addresses of all Members, and the Company's federal, state, and local tax accounts and returns. The Company's financial books and records shall be maintained in accordance with sound accounting principles consistently applied (and consistent with requirements for performance of the Contract). This Section 14.2 shall survive the termination of this Agreement.

**14.2.2 Location of Records.** The books and records of the Company shall be kept at the offices of the Managing Member, unless approval to keep them elsewhere is granted by the SBA based upon the Company's written request and all Members are given at least five (5) days prior notice of where and when such books and records will be so moved. Upon completion of the Contract, the Company's original books and records shall be retained by the Managing Member.

**14.2.3 Inspection of Records.** The books and records of the Company shall be available for examination and copying by any Member or the Member's duly authorized representative or auditor at all reasonable times during normal business hours. Those books and records shall also be available for examination by the SBA without notice at any time it deems necessary.

**14.2.4 Annual Accounting Period.** The Company's fiscal year and tax year shall be Calendar Year (CY), subject to the requirements and limitations of the Code.

14.3 **Reports**

**14.3.1 State/Federal Reports.** The Members shall file any reports that may be required by state or federal law for the transaction of business by the Company.

**14.3.2 Reports to Members.** Within seventy-five (75) days after the end of each taxable year of the Company, the Management Committee shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended an annual financial statement, audited by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants. In addition, within seventy-five (75) days after the end of each taxable year of the Company, the Management Committee shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company necessary for preparing the Interest Holder's federal, state, and local income tax returns for that year.

**14.3.3 Reports to SBA.** Quarterly financial statements showing cumulative Contract receipts and expenditures (including salaries of the Managers) shall be submitted to the SBA no later than forty-five (45) days after each fiscal quarter of the Company. A project-end profit and loss statement, including a statement of final profit distribution, shall be submitted to the SBA no later than ninety (90) days after close-out of the Contract.

**14.4 Tax Matters Member.** If there are tax matters, the Responsible Manager shall keep all Members informed of all notices from government taxing authorities that may come to the attention of the Tax Matters Member. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Member in performing those duties. The Tax Matters Member shall not settle or otherwise compromise any dispute with the Internal Revenue Service without the approval of the Members.

**14.5 Tax Elections.** The Management Committee shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation, and elections under Section 754 of the Code. The decision to make or not make an election shall be at the Management Committee's sole and absolute discretion.

**14.6 Title to Company Property.** All real and personal property owned, leased, or otherwise held by the Company shall be acquired, leased, or held by the Company in its name.

**14.7 Confidential Information.** The Members anticipate that, to perform the Contract, it may be necessary for each Member to provide confidential and/or proprietary information to the Company and/or the other Member. Each Member agrees that it shall at no time, either during or after the term of this Agreement, utilize or disclose to any third party any confidential and/or proprietary information or trade secrets of the Company or the other Member, except as may be expressly authorized under this Agreement. Each of the Members agrees that it will use the same reasonable efforts to protect such confidential and/or proprietary information and trade secrets as it uses to protect its own confidential and/or proprietary information and trade secrets. No information shall be within the protection of this Section 14.7 where such information: (a) is or becomes publicly available; (b) is lawfully obtained from third parties; or (c) is or becomes known or developed by the receiving Member independently of the confidential and/or proprietary information of the originating Member.

**14.8 Inventions and Discoveries**

**14.8.1** For purposes of this provision, the term Intellectual Property shall mean patented and unpatented inventions, mask works, copyrighted works, trade secrets, know-how, and proprietary information of either Member (hereinafter "Intellectual Property"). It is mutually understood and agreed that neither Member shall acquire, directly or by implication, any ownership, rights, title, or interest in any Intellectual Property owned, controlled, acquired, created, developed, authored, conceived, or reduced to practice by the other Member prior to the date of this Agreement.

**14.8.2** During the performance of the Contract, each Member shall retain exclusive ownership, rights, title, and interest to any Intellectual Property acquired, created, developed, authored, conceived, or reduced to practice by the Member independently of the other Member. In such event, no ownership, rights, title, interest, or license, express or implied, in the Intellectual Property shall inure to the benefit of the other Member.

**14.8.3** If in the performance of the Contract the Members jointly acquire, create, develop, author, or reduce to practice any Intellectual Property (hereinafter "Joint Intellectual Property"), the Members shall jointly own in equal shares all right, title, and interest in the Joint Intellectual Property unless specifically and expressly provided otherwise in a subsequent written agreement between the Members. Each Member shall have the unrestricted right to use the Joint Intellectual Property and to license any third party to use the Joint Intellectual Property without the consent of the other Member and without any duty to account to or to share

proceeds with the other Member resulting from its use or licensing of the Joint Intellectual Property. The Members shall cooperate in filing, prosecuting, and securing any application or registration required to perfect or enforce the Members' interests in the Joint Intellectual Property under the names of both Members as joint owners. All Members shall bear its proportionate share of expenses in filing, prosecuting, securing, and defending the Members' interests in the Joint Intellectual Property. All rights in the Joint Intellectual Property created in the performance of the Contract are subject to the Government's rights under the Contract.

**14.8.4** Except as otherwise expressly provided in this Agreement, nothing in this Agreement shall be deemed to grant to any Member, directly or by implication, any ownership, right, title, interest, or license with respect to any Intellectual Property.

**14.9 Non-Solicitation of Personnel.** Each Member agrees that absent prior written consent from the other Member, it shall not, during the term of this Agreement and for a period of one hundred eighty (180) days thereafter, directly or indirectly, employ or offer to employ any personnel of the other Member.

**14.10 Specific Performance.** Notwithstanding anything to the contrary contained in Section 16.3, the Members agree that monetary damages would not be a sufficient remedy for certain breaches of this Agreement, including those under Sections 14.7, 14.8 and 14.9, and that a Member shall be entitled to seek equitable relief, including injunction and specific performance, in the event of any breach thereof by the other, in addition to all other remedies available at law or in equity.

## ARTICLE XV - PROJECT PROVISIONS

**15.1 Responsibilities Regarding Proposal and Negotiation. The company with the project management** shall be primarily responsible for the development of the proposal and, if the proposal is accepted, **the company with the Project Manager** shall lead the negotiations of the Contract.

**15.2 Negotiation of Lower Tier Subcontracts**. The responsibilities of the Members with regard to negotiation of any lower tier Subcontracts shall be as follows: The Project Manager shall negotiate all Subcontracts, subject to the policies and procedures promulgated by the Management Committee and this Agreement and the exhibits and schedules hereto. Each Member may enter into subcontracts for that portion of the work performed by the Member through task orders issued by the Company.

**15.3 Contract Performance and Sources of Labor.** The sources of labor, materials, and equipment for the performance of the Contract shall be as provided for in the Joint Venture Agreement and the Company's proposal for the Contract.

## ARTICLE XVI - OTHER PROVISIONS

**16.1 Assurances.** Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Management Committee deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

**16.2 Notifications**. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or by facsimile transmission or sent by certified or registered mail, postage prepaid, return receipt requested, or sent by email (with, if available under email options, a "delivery receipt" and a "read receipt" being requested). Any notice to be given hereunder by the Company shall be given by the Management Committee. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office in the State of Missouri, as determined pursuant to Section 1.1. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; thereafter, notices are to be directed to those substitute addresses or addressees.

**16.3 Applicable Law**. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of MISSOURI.

**16.4 Dispute Resolution**.

**16.4.1** The Members shall submit all unresolved disputes, claims, or controversies arising out of or relating to this Agreement, its breach or execution of the work to the chief executive officer/president of each Member for resolution prior to either Member initiating against the other a demand for mediation pursuant to Section 16.4.1, unless delay in initiating or prosecuting a proceeding in mediation would prejudice either of the Members. The chief executive officer/president of each Member shall negotiate in good faith to settle the disputes, claims, or controversies within thirty (30) days.

**16.4.2** If the Members cannot resolve the dispute, claim, or controversy through the process and timeframe set forth in Section 16.4.1, then the dispute shall be settled in mediation and shall be resolved by a mediator of the American Arbitration Association. The mediator shall decide, resolve and determine the claim or controversy. The written decision of the mediator shall be final and conclusive upon the Members. Judgment on such decision may be entered in the highest court or forum having jurisdiction. While the mediation proceeding is pending, work on the Contract will continue without interruption until completion.

**16.5 Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

**16.6 Amendment**. This Agreement may be amended in accordance with Section 17.3.1; provided, that all amendments and deviations from the requirements of this Agreement shall be (i) in writing and signed by all Members and not conflict with this Agreement between the parties.

**16.7 Consents**. Unless otherwise explicitly provided for herein, any and all consents, agreements, or approvals provided for or permitted by this Agreement shall be in writing and a signed copy thereof shall be filed and kept with the books of the Company.

**16.8 Whole Agreement**. This Agreement, together with the Joint Venture Agreement, is an integrated agreement and embodies the complete agreement and understanding among the Members with

respect to the subject matter hereof and supersedes any prior understandings, agreement, and representations by or among the Members which may have related to the subject matter hereof. No Member may unreasonably rely on an oral representation made by the other Member. In the event of a conflict between a provision in this Agreement and a provision in the Joint Venture Agreement, the provision in the Joint Venture Agreement shall control.

**- Remainder of Page Intentionally Left Blank; Signature Page Follows –**

IN WITNESS WHEREOF, this Agreement is executed by the following authorized representatives of **ETEGRA** and **CooverClark** as of the date first written above.

| ETEGRA, Inc. | CooverClark & Associates, Inc. |
| --- | --- |
| **Kenneth A. Hinrichsen**<br>Chief Technical Officer | **Charles David Clark**<br>Operations Manager |
| 09/17/2021<br>**Date** | 09/17/2021<br>**Date** |
| **Federal Tax I.D. Number** | **Federal Tax I.D. Number** |

**Designated Type of Organization:**

( X ) Corporation _S-Corporation___
(   ) Partnership
(   ) Sole Proprietorship

**Designated Type of Organization:**

( X ) Corporation _S-Corporation___
(   ) Partnership
(   ) Sole Proprietorship

## APPENDIX A
**Members' Names, Addresses, and Percentage Interests**

| Name/Address | Percentage Interest |
| --- | --- |
| ETEGRA, Inc.<br><br>1121 Olivette Executive Parkway, Suite 100<br>Olivette, Missouri 63132<br><br>Attn: Kenneth A. Hinrichsen | 51% |
| CooverClark & Associates, Inc.<br><br>1936 Market Street<br>Denver, Colorado 80202<br><br>Attn: Carol Coover-Clark | 49% |

## APPENDIX B
## Management Committee

Appointed by **ETEGRA, Inc**.

- ✓ Thandav (RT) Murthy
- ✓ Kenneth A. Hinrichsen

Appointed by **CooverClark & Associates, Inc.**

- ✓ Carol Coover-Clark
- ✓ Charles David Clark

## APPENDIX C
## Project Managers

Appointed by **CooverClark**

- ✓ Gary Coover (Civil Engineering)
- ✓ Margaret Linton (Architecture, Planning, Landscape Architecture)
- ✓ Jeff Lipinski (Architecture, Planning, Landscape Architecture)

Appointed by **ETEGRA, Inc**.

- ✓ Bruce Preston
- ✓ David Peters
- ✓ Boston Fodor
- ✓ Michael Wells
- ✓ Mary Beth Oberlin
- ✓ Richard Halteman